**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
BATESVILLE DIVISION**

RHONDA FAIRCLOTH                                                                                           PLAINTIFF

v.                                                    No. 1:05CV00089 JLH

SHERIFF KEITH BOWERS, individually,
and in his official capacity as Sheriff of
Independence County, Arkansas; and
JIM STARZY, in his individual capacity                                                              DEFENDANTS

**OPINION AND ORDER**

This is an employment discrimination case. Rhonda Faircloth[1] brought claims against her supervisors, Keith Bowers, individually and in his official capacity as Sheriff of Independence County, Arkansas, and Jim Starzy, in his individual capacity. Faircloth alleges gender discrimination under Title VII of the Civil Rights Acts of 1964 (42 U.S.C. § 2000e *et seq.*) and the Arkansas Civil Rights Act of 1993 (ARK. CODE ANN. § 16-123-107); retaliation under the Arkansas Civil Rights Act (ARK. CODE ANN. § 16-123-108); and equal protection violations under 42 U.S.C. § 1983. The defendants have moved for summary judgment. For the reasons stated below, this motion is denied.

A court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The party moving for summary judgment bears the initial responsibility of informing the district court of the basis of its motion and identifying the portions

---

[1] Faircloth testified in her deposition that she has changed her name to Rhonda Dowell, her maiden name, since she filed this lawsuit. Faircloth is thus referred to as Rhonda Dowell in some of the documents that the parties have submitted as evidence.

of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 763 (8th Cir. 2003). When the moving party has carried its burden under Rule 56(c), "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting FED. R. CIV. P. 56(e)). The nonmoving party sustains this burden by showing that "there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511. When a nonmoving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2552. In deciding a motion for summary judgment, the Court must view the facts and inferences in the light most favorable to the party opposing summary judgment. *Boerner v. Brown & Williamson Tobacco Corp.*, 260 F.3d 837, 841 (8th Cir. 2001) (citing *Rabushka ex rel. U.S. v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997)). If the evidence would allow a reasonable jury to return a verdict for the non-moving party, summary judgment should be denied. *Derickson v. Fidelity Life Ass'n*, 77 F.3d 263, 264 (8th Cir. 1996) (citing *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510).

The Eighth Circuit has said "that 'summary judgment seldom should be granted in discrimination cases where inferences are often the basis of the claim.'" *Duncan v. Delta Consol. Indus., Inc.*, 371 F.3d 1020, 1024 (8th Cir. 2004) (quoting *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir. 1999)); *see also Bassett v. City of Minneapolis*, 211 F.3d 1097, 1099

(8th Cir. 2000). *But see Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 762 (8th Cir. 2004) (Arnold, J., dissenting).

## I.

Faircloth began working for the Independence County Sheriff's Office in 1993 as a Jail Matron.[2] She was promoted in 1996 to Sergeant, and again in 2001 to the position of Jail Administrator. As Jail Administrator, Faircloth was in charge of the county's adult detention center.

On February 4, 2005, Sheriff Keith Bowers received a memorandum from Independence County Judge Bill Hicks regarding the 2005 budget requests. This memorandum stated that the county was expecting to have some budget cuts and that the county department heads should reduce their budget requests by 8.8%. A few days later, Bowers issued a memorandum to his employees notifying them of the budget cuts and stating that Bowers had no choice but to reduce personnel.

Soon after that, Faircloth was demoted to the position of Assistant Administrator. This demotion resulted in a $5,000 reduction in Faircloth's annual salary. Bowers and Faircloth both testified that Faircloth had no performance problems in her position as Jail Administrator and that she had received no disciplinary actions. The defendants assert that Faircloth was demoted due to the budget cuts.

Tori Walls, a female employee who had been the Assistant Administrator, was demoted to the position of Jail Matron. Walls's demotion resulted in a salary reduction of about $7,000. Bowers testified that Walls did a good job, but had "some attitude and some unhappiness towards [Bowers] and the county in general" after her demotion and salary cut. Walls never received any disciplinary actions, however, for her job performance.

---

[2] A matron is a female jailer.

Bowers testified that after Faircloth's demotion, Bowers considered making Lieutenant Curtis Goodrich, who was then in charge of patrol for the Sheriff's Office, the new Jail Administrator. Goodrich would not have been required to take a pay cut. Bowers stated that he did not know whether Goodrich had any jail experience. Bowers further testified, however, that Goodrich voluntarily retired and thus never became the Jail Administrator.

Bowers then decided to place Captain Bill Lindsey in charge of the jail. Bowers testified that he did not know if Lindsey had ever run a jail, but that Lindsey had experience with most phases of law enforcement and was familiar with the jail. Lindsey assumed the administrative duties at the jail in addition to his duties as a Captain with the Sheriff's Office. Lindsey did not receive a raise for performing these additional duties. Bowers did not know how much time Lindsey spent at the jail after he was placed in charge of it but testified that Faircloth performed the majority of the duties of running the jail. The record is unclear as to the length of time that Lindsey served as Jail Administrator, but the parties agree that after a short period of time Bowers determined that the work load was too much for Lindsey to handle.

Bowers then decided to make Jim Starzy, who had been the Juvenile Jail Administrator, the new Administrator for both the adult and juvenile detention centers. Starzy is certified to operate both adult and juvenile detention centers. Faircloth is certified to operate adult detention centers, but she is not certified to run juvenile facilities and is not knowledgeable about the specific rules and regulations affecting such facilities.

In April 2005, Starzy took over as the Administrator for both facilities and received an annual salary increase of $10,000. When asked how this arrangement would save the county money, Bowers admitted that Starzy's salary increase consumed almost all of the savings achieved by cutting

Faircloth's and Walls's salaries. Bowers stated, however, that Starzy "had a lot of success with managing the juvenile and keeping the budget in line and saving money," so Bowers "was anticipating and hoping that the budget savings would offset whatever [the county was] paying him at the time." Bowers did not remember whether Starzy had a specific plan to control the jail's budget.

Faircloth and Lindsey both testified that Lindsey suggested to Faircloth that she file a gender discrimination lawsuit. Lindsey testified, however, that he meant that Faircloth should sue the Quorum Court of Independence County, as he believed that they had wanted a male in the Jail Administrator position. Faircloth filed a charge of gender discrimination with the EEOC.[3]

Faircloth testified that since she filed her EEOC charge, Starzy has treated her unfavorably in several respects. Faircloth alleges that the day after Starzy received her EEOC complaint he issued a disciplinary citation to her without cause, but a few days later denied that his actions were disciplinary in nature. Faircloth also testified that since she filed the EEOC complaint Starzy has repeatedly called her into his office, questioned her about the lawsuit, and told her that she "would be better off to just drop it." During one of these incidents Starzy allegedly told her that he heard about a book called "Fired" and that "he thought of [Faircloth] when he heard that because it was stories about people who had been fired."

During the year after Starzy was promoted he hired a Nurse at the jail and created a new Facility Sergeant position. Starzy hired males for both positions. Bowers, Starzy, and Faircloth all testified that the Facility Sergeant, Rick Shepard, performs essentially the same duties that Walls had performed when she was Assistant Administrator. Walls applied for the Sergeant position after her

---

[3] The record does not reveal the date on which Faircloth filed this complaint.

demotion to Matron, but Starzy hired Shepard instead.  Starzy acknowledged that Walls had experience performing the job, but testified that he hired Shepard because Shepard possessed superior computer skills.  Faircloth and Starzy both testified that Starzy then gave Faircloth's office to Shepard and moved Faircloth into a shared office space with Starzy's secretary.  During his deposition, Starzy was asked, "[D]id you ever tell [jail employee] Tonya Templin that you needed a male in the position that Rick Shepard got?"  Starzy replied, "I don't remember.  I asked Tonya if she could work with a male nurse."

The Facility Sergeant position cost the county an additional $25,000 for Shepard's salary.  Bowers acknowledged in his deposition that this additional expense was implemented after the budget cuts, but he testified that Starzy had saved enough money through his management of the jail's budget to cover the expense.  Bowers also testified in an affidavit that the total spending for the county jail was lower in 2005 and 2006 than it was in 2004.  He attributed the savings to Starzy.

In May 2006, Starzy issued a memorandum that stated:

> Effective immediately, all jail guards need to follow the chain of command.  Day to day questions, incidents, problems, time off request and overtime requests, etc. need to go through Sgt. Rick Shepard.  When Sgt. Shepard is not available, or in an emergency situation, you can go the ast. administrator, Rhonda [Faircloth].  However, as the jail administrator, I always have an open door policy for the jail staff.
>
> Attached is a copy of the chain of command here at the jail.

The "copy of the chain of command" that Starzy referred to was an organizational chart depicting the titles of various personnel inside boxes.  The boxes were connected by a series of solid and dotted lines.  On this chart, the box for the Assistant Jail Administrator position is drawn below the

boxes for the Secretary[4] and the Food Service Manager. Starzy and Faircloth both testified that the Secretary and the Food Service Manager had previously reported to Faircloth.

Later that month, Starzy told Faircloth "that there was a Spanish class coming up and to get a couple of people in that class." Faircloth stated that she asked Starzy to send Walls and her to the class, but "[h]e said that would be useless." When Faircloth asked Starzy what he meant by "useless," he said "he wanted to send somebody that was going to be there. Meaning employed with the county."

Starzy testified that during his tenure as Administrator he started keeping written records of Faircloth's shortcomings as Assistant Administrator and that he did so to "cover [his] butt." Starzy was then asked if he "knew there was going to be this problem with [Faircloth]." He testified: "Yeah, I knew. I knew. She wasn't happy I was there. I didn't realize that until I went down there. She wanted to go home the first day. She was sick. I made her stay there. She had a female problem or something."

## II.

**A.    Sex Discrimination**

Under Title VII, an employer[5] cannot discharge or otherwise "discriminate against any

---

[4] The Secretary position is shown on the organizational chart as "Administrative Assistance/Marton" [sic]. Faircloth and Starzy both testified that this Secretary position is now held by Walls.

[5] "[S]upervisors and other employees cannot be held liable under Title VII in their individual capacities." *Lenhardt v. Basic Inst. of Tech., Inc.*, 55 F.3d 377, 381 (8th Cir. 1995). Similarly, such employees are not liable in their individual capacities under the Arkansas Civil Rights Act unless they fit the definition of an "employer" stated in ARK. CODE ANN. § 16-123-102(5). *Morrow v. City of Jacksonville, Ark.*, 941 F. Supp. 816, 819-20 (E.D. Ark. 1996). The individual capacity defendants in this case have not argued that they are not employers under the statutes, however, and have not moved for summary judgment as to Faircloth's Title VII and

individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). The Arkansas Civil Rights Act guarantees "[t]he right of an otherwise qualified person to be free from discrimination because of . . . gender," including "[t]he right to obtain and hold employment without discrimination." ARK. CODE ANN. § 16-123-107(a)(1). "The Arkansas Supreme Court looks to decisions interpreting the federal civil rights laws in analyzing gender discrimination claims under the Arkansas Civil Rights Act . . . ." *Crone v. United Parcel Serv., Inc.*, 301 F.3d 942, 945 (8th Cir. 2002) (citing *Flentje v. First Nat'l Bank*, 340 Ark. 563, 570-72, 11 S.W.3d 531, 537 (2000)). Faircloth's sex discrimination claims under both statutes are therefore analyzed under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of sex discrimination by showing that (1) she is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of unlawful discrimination. *See Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 760 (8th Cir. 1998). If the plaintiff does so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *See id.* If the employer offers such a reason, the plaintiff must then present evidence sufficient to create a fact issue as to whether the employer's articulated reason is pretextual and to create a reasonable inference that gender was a motivating factor. *See id.*

### 1.   **Prima Facie Case of Sex Discrimination**

The defendants do not dispute that Faircloth has satisfied the first and third elements

---

Arkansas Civil Rights Act claims on this basis.

necessary to establish a prima facie case. Faircloth, who is female, is a member of a protected class, and she suffered an adverse employment action when she was demoted from her position as Jail Administrator to the position of Assistant Administrator. The defendants assert, however, that Faircloth has failed to establish the second and fourth elements, arguing that she was not qualified for her job and that she has not produced evidence of facts that give rise to an inference of sex discrimination.

      **a.**      **Job Qualifications**

A plaintiff's "qualifications are demonstrated when the employee 'actually performs her job at a level that [meets her] employer's legitimate expectations.'" *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1047 (8th Cir. 2005) (quoting *Whitley v. Peer Review Sys., Inc.*, 221 F.3d 1053, 1055 (8th Cir. 2000)). The unrebutted testimony of Bowers and Faircloth is that Faircloth satisfactorily performed her job as Jail Administrator; she had no performance problems in this position and received no disciplinary actions. The defendants have neither argued nor produced evidence that Faircloth was not qualified for her position as Jail Administrator.

The defendants argue instead that Faircloth is not qualified for the combined position of Administrator of both the adult and juvenile detention centers, the position that Starzy now holds. This argument fails because the relevant inquiry is whether the plaintiff was qualified for her job at the time of the adverse employment action, not whether she is qualified for a different job that was created later. *See Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 662-63 (6th Cir. 2000) (stating that a determination of whether a plaintiff was qualified for her job involved assessing whether the plaintiff was meeting her employer's expectations prior to the onset of events that the employer cited as its reason for taking an adverse employment action). *Cf. Davenport v. Riverview Gardens Sch.*

*Dist.*, 30 F.3d 940, 944-45 (8th Cir. 1994) (reversing district court's finding that plaintiff had not established that he was qualified because of alleged performance violations that the employer cited as a legitimate, nondiscriminatory reason for termination; courts must not conflate the low threshold of proof necessary to establish a prima facie case with burden of proving pretext).

The combined administrative position did not exist when Faircloth was demoted, and the defendants' alleged reason for her demotion is the county's budget cuts. Following Faircloth's demotion from her position as Jail Administrator, Bowers considered transferring Goodrich into the position, then added the Jail Administrator duties to Lindsey's existing job. The defendants have neither alleged nor produced evidence that either of these men was certified to operate a juvenile detention center or that such certification was required.

### b.     Inference of Sex Discrimination

As to the fourth element necessary to make a prima facie case, the defendants argue that Faircloth has not produced evidence of facts sufficient to give rise to an inference of discrimination. "[E]vidence of pretext – normally considered only at step three of the *McDonnell Douglas* analysis – satisfie[s] this aspect of the plaintiff's prima facie case burden." *Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003).

Pretext may be demonstrated in several ways. "Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext[,]" *Kobrin v. Univ. of Minn.*, 34 F.3d 698, 703 (8th Cir. 1994), as does evidence that the employer's proffered reason is dubious, *see Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1023 (8th Cir. 1998). Evidence that an employer selected a less-qualified candidate also supports a finding that the employer's nondiscriminatory reasons for its decision were pretextual. *Peterson v. Scott County*, 406

F.3d 515, 523 (8th Cir. 2005).

The evidence suggests that the defendants are changing, or at least supplementing, their reasons for Faircloth's demotion after the fact. The parties do not dispute that the defendants' stated reason for Faircloth's demotion at the time she was reassigned to the Assistant Administrator position was the county's decision to reduce personnel due to budget cuts. Though the defendants continue to assert that the county suffered budget cuts, they now also assert that Faircloth is not qualified and that the jail's budget under Faircloth was out of control. Faircloth's lack of certification to operate a juvenile facility was never mentioned at the time of her demotion, nor was her alleged inability to control the jail's budget.

Faircloth also testified, and Bowers admitted in his deposition, that Starzy received a salary increase that was almost equivalent to the total decrease in salary that Faircloth and Walls suffered. This calls into doubt whether Faircloth's demotion was motivated by a desire to save money.

Faircloth further argues that she has been replaced as Jail Administrator by males who were less qualified. The parties agree that Faircloth possesses the requisite certification to operate an adult detention facility, began working at the Independence County jail in 1993, and became the Jail Administrator in 2001. Bowers testified that he first considered transferring Goodrich into the Jail Administrator position, but did not know whether Goodrich had any jail experience. Bowers then placed Lindsey in charge of the jail, but he testified that he did not know whether Lindsey had ever run a jail. Although the defendants assert that Starzy is more qualified than Faircloth to hold the position of Administrator of both the adult and juvenile facilities because he is certified in both areas, Faircloth has presented evidence that Starzy is not qualified to be the Administrator of the adult facility. Faircloth testified that Starzy lacks basic competence in the day-to-day operations of

the jail, including the commissary system, waivers of extradition, booking, processing an inmate, working with the district court liaison, conducting disciplinary hearings, and using touch screens to open doors in the jail.

This evidence, viewed as a whole, creates an issue of fact as to whether the defendants' asserted reason for Faircloth's demotion was merely a pretext for sex discrimination. Faircloth has thus satisfied the fourth element necessary to establish a prima facie case.

### 2. Legitimate, Nondiscriminatory Reason

Because Faircloth has established a prima facie case, raising a presumption of discrimination, the defendants must articulate a legitimate, nondiscriminatory reason for Faircloth's demotion. The defendants have met this burden by stating that Faircloth and Walls were demoted due to budget cuts that affected both male and female employees. While Faircloth denies that the budget cuts were the real reason for her demotion, she acknowledges that this reason as presented by the defendants is nondiscriminatory.

### 3. Pretext for Sex Discrimination

The burden thus shifts back to Faircloth to establish that this reason is merely pretextual and that her sex was the true reason for her demotion. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-17, 113 S. Ct. 2742, 2752, 125 L. Ed. 2d 407 (1993) (stating that a plaintiff must show that employer's proffered reason is pretext for unlawful discrimination, not that it is merely false in some way). The Eighth Circuit has held, however, that "an inference of discrimination may sometimes arise 'without additional evidence where the overall strength of the prima facie case and the evidence of pretext suffice[s] to show intentional discrimination.'" *Young*, 152 F.3d at 1023 (quoting *Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1337 (8th Cir. 1996)). Although an employer's

articulation of a legitimate, nondiscriminatory reason for its actions rebuts the presumption of discrimination created by the prima facie case, the elements of the prima facie case remain and, if accompanied by evidence of pretext and disbelief of the proffered reason, may permit the jury to find for the plaintiff if this evidence is consistent with a reasonable inference of discrimination. *Ryther v. KARE 11*, 108 F.3d 832, 837 (8th Cir. 1997) (en banc). As discussed above, Faircloth has produced considerable evidence of pretext in this case from which a jury could infer discrimination.

Faircloth notes that female employees bore the brunt of the county's budget cuts. The parties do not dispute that Faircloth and Walls, both females, were demoted and took salary reductions. No male employee was demoted. Bowers testified that he considered transferring Goodrich, but that would have been a lateral move. Starzy, a male, was promoted and received a salary increase. The parties agree that a secretary, who was female, and a matron, *i.e.*, female jailer, were laid off. One jailer, a male employee, resigned shortly before the budget cut demands and was not replaced. The defendants assert that the sheriff's office was also "forced to lay off" a lieutenant, but the evidence is unclear as to which lieutenant was affected and whether that employee was laid off or retired. Faircloth asserts that the lieutenant in question was Goodrich, a male. While the defendants point out that Faircloth testified that Goodrich was laid off, the defendants fail to mention that Bowers testified in his deposition that Goodrich, who worked for Bowers, voluntarily retired. Bowers later testified in an affidavit that he laid off the Certified Deputy Bailiff in the jail. This employee's name and gender were not specified. A facility sergeant and a nurse, both male, were later hired by Starzy. Even if a jury believes that the defendants were forced to reduce personnel due to budget cuts, a jury could reasonably infer that the decisions as to which employees would be adversely affected were based on gender.

The defendants' motion for summary judgment as to Faircloth's sex discrimination claims under Title VII and the Arkansas Civil Rights Act is denied.

**B.     Retaliation**

The Arkansas Civil Rights Act provides that "[n]o person shall discriminate against any individual because such individual in good faith has opposed any act or practice made unlawful by this subchapter or because such individual in good faith made a charge . . . under this subchapter." ARK. CODE ANN. § 16-123-108(a). The Arkansas Civil Rights Act further provides that it is "unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, . . . any right granted or protected by this subchapter. *Id.* § 16-123-108(b).

"To overcome summary judgment on a retaliation claim under ACRA, a plaintiff must make the same showing as is required on an analogous claim under Title VII." *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 861 (8th Cir. 2005). To establish a claim of retaliation in violation of Title VII, a plaintiff must show the following elements: "(1) the plaintiff filed a charge of harassment or engaged in other protected activity; (2) the plaintiff's employer subsequently took adverse employment action against the plaintiff; and (3) the adverse action was causally linked to the plaintiff's protected activity." *Cross v. Cleaver*, 142 F.3d 1059, 1071 (8th Cir. 1998). "Once this *prima facie* showing is made, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions, and, if the employer meets that burden, the presumption of retaliation disappears." *Id.* at 1071-72. If the employer does this, the plaintiff has the burden to identify specific facts in the record showing that the offered reason was merely pretextual and that unlawful retaliation was a motivating factor for the decision. *E.E.O.C. v. Kohler Co.*, 335 F.3d 766,

773 (8th Cir. 2003).

### 1. Prima Facie Case of Retaliation

The defendants concede that Faircloth has met the first element necessary for a prima facie case of retaliation: she engaged in a protected activity when she filed her EEOC charge of sex discrimination. The defendants assert, however, that Faircloth has not established the second and third elements. Faircloth's prima facie case thus turns on whether she has produced evidence that she suffered an adverse employment action and that the adverse action was causally linked to her EEOC charge.

#### a. Adverse Employment Action

The defendants argue that Faircloth did not suffer an adverse employment action after she filed her EEOC charge. The Eighth Circuit has defined "adverse employment action" in the context of Title VII claims as "a tangible change in working conditions that produces a material employment disadvantage." *Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 853 (8th Cir. 2000). Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's career meet this standard, but minor changes or inconveniences do not. *Id.* Generally, a poor performance evaluation, denial of an employee's request for training, or change of job responsibilities, alone, does not constitute an adverse employment action. *See id.* at 854 (discussing performance evaluations); *Box v. Principi*, 442 F.3d 692, 696-97 (8th Cir. 2006) (addressing alteration of job responsibilities and denial of training).

While the Court recognizes that Arkansas Civil Rights Act retaliation claims are to be analyzed under the same framework as Title VII retaliation claims and that the Eighth Circuit has defined "adverse employment action" in this context, the language of the Arkansas Civil Rights

Act's retaliation provision contains broader prohibitions on retaliatory conduct than Title VII's. The Arkansas Civil Rights Act and Title VII both prohibit discrimination against an employee because she has made a charge of sex discrimination. *See* 42 U.S.C. § 2000e-3(a); ARK. CODE ANN. § 16-123-108(a). Title VII, however, does not contain a provision similar to Arkansas Civil Rights Act's provision that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual" for making such a charge. *See* ARK. CODE ANN. § 16-123-108(b). The Court could find no cases interpreting this provision of the Arkansas Civil Rights Act. However, Starzy's alleged conduct in repeatedly questioning Faircloth about her lawsuit, telling her that she "would be better off to just drop it," and telling her that he thought of her when he heard of a book about people who had been fired could reasonably be construed as actions to "coerce, threaten, intimidate, or interfere with" Faircloth according to the plain and ordinary meaning of those terms.

Even if Faircloth is required to show that she suffered an adverse employment action as defined in the context of Title VII, however, Faircloth has presented evidence sufficient to meet the minimum threshold required for a prima facie case. While an isolated event such as denying an employee a training opportunity may not constitute an adverse employment action, the Eighth Circuit has explained that a series of unfavorable actions toward an employee can rise to this level.

> In *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997), this court held that an employer took adverse employment action when it gave the employee lower performance evaluations, warned him about his poor attitude, characterized him as unmotivated, placed him under constant surveillance, excluded him from meetings, required him to undergo remedial retraining, and placed written reprimands in his file. This court held that these acts constituted an adverse employment action. *Id.* at 1053. Specifically, the court reasoned that the employer's actions "are the kind of serious employment consequences that adversely affected or undermined Kim's position, even if he was not discharged, demoted or suspended."

*McClure v. Career Sys. Dev. Corp.*, 447 F.3d 1133, 1137 (8th Cir. 2006) (emphasis omitted). *Cf.*

16

*Burlington N. & Santa Fe Ry. Co. v. White*, __ U.S. __, __, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006) ("[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context [of a retaliation claim] means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"). If the jury credits Faircloth's testimony that Starzy issued a disciplinary citation to her without cause, denied her a training opportunity, reduced her authority and responsibilities by moving her down the chain of command, took her office away, told her to drop her lawsuit, and made thinly veiled threats to fire her, the jury could reasonably conclude that Faircloth suffered an adverse employment action.

    **b.**  **Causal Connection**

Although more than a temporal connection between a plaintiff's protected activity and the alleged retaliation is generally required to establish causation, a very close temporal connection can, in some circumstances, suffice to show the "causal connection" necessary to establish a prima facie case of retaliation. *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 915-16 (8th Cir. 2006); *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 715-16 (8th Cir. 2000). A plaintiff may also prove causation with circumstantial evidence that justifies an inference of a retaliatory motive, and such evidence must be evaluated along with temporal proximity. *Wedow v. City of Kansas City*, 442 F.3d 661, 675 (8th Cir. 2006).

The alleged series of events that Faircloth claims were retaliatory began on the day after Starzy received Faircloth's EEOC complaint, which certainly represents a close temporal proximity. Of course, the other alleged events occurred over a broader period of time. Some of Starzy's alleged actions provide circumstantial evidence of retaliatory motive, however, such as his repeated inquiries about her lawsuit and his telling her to drop the lawsuit. Viewing the evidence as a whole, a jury

17

could reasonably conclude that the defendants sought to retaliate against Faircloth for filing a charge of sex discrimination.

### 2. Legitimate, Nondiscriminatory Reason

The defendants offer no reason for Starzy's alleged conduct, instead resting on their position that no adverse employment action occurred. Because the defendants have offered no legitimate, nondiscriminatory reason for the alleged retaliation, the presumption of retaliation raised by Faircloth's prima facie case remains unrebutted. The defendants' motion for summary judgment as to Faircloth's retaliation claim is therefore denied.

### C.    Equal Protection Under 42 U.S.C. § 1983

Forty-two U.S.C. § 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States by any person acting "under color of" state law. Intentional sex discrimination in public employment violates the Equal Protection Clause of the Fourteenth Amendment and is thus actionable under § 1983.[6] *See, e.g.*, *Marshall v. Kirkland*, 602 F.2d 1282, 1298-1301 (8th Cir. 1979).

The *McDonnell Douglas* burden-shifting analysis applies to § 1983 claims for equal protection violations. *See, e.g.*, *Floyd v. State of Mo. Dep't of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir. 1999); *Richmond v. Bd. of Regents of Univ. of Minn.*, 957 F.2d 595, 598 (8th

---

[6] Faircloth's Title VII sex discrimination claim is not actionable under § 1983 because a § 1983 action may not be brought to vindicate rights conferred only by a statute that contains its own structure for private enforcement, such as Title VII. *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). Faircloth's Arkansas Civil Rights Act sex discrimination and retaliation claims are not actionable under § 1983 because the Arkansas Civil Rights Act is a state statute; § 1983 creates a cause of action only for violations of federal constitutional and statutory rights. *See Alexander v. Peffer*, 993 F.2d 1348, 1349 (8th Cir. 1993) (ruling that § 1983 does not provide a remedy for abuses of state power that do not violate federal law).

Cir. 1992). As explained above, the defendants have failed to establish that they are entitled to summary judgment on Faircloth's sex discrimination claim under this analysis. The defendants' motion for summary judgment as to Faircloth's equal protection claim under § 1983 is therefore denied.

**D.     Qualified Immunity**

The defendants contend that they are entitled to qualified immunity. The Eighth Circuit has explained the qualified immunity doctrine as follows:

> Under the doctrine of qualified immunity, state actors are protected from civil liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) (internal quotations omitted); *McCaslin v. Wilkins,* 183 F.3d 775, 778 (8th Cir. 1999). The qualified immunity inquiry is a two-step process. First, this Court must ascertain whether the plaintiffs have asserted a violation of a constitutional or statutory right. *See Munz v. Michael,* 28 F.3d 795, 799 (8th Cir. 1994) (citing *Beck v. Schwartz,* 992 F.2d 870, 871 (8th Cir. 1993) (per curiam)). Second, we must determine whether that constitutional right was clearly established at the time that the plaintiffs were discharged. *See Munz,* 28 F.3d at 799. "This court has . . . taken a broad view of what constitutes 'clearly established law' for the purposes of a qualified immunity inquiry . . . ." *Boswell v. Sherburne County*, 849 F.2d 1117, 1121 (8th Cir. 1988), *cert. denied*, 488 U.S. 1010, 109 S. Ct. 796, 102 L. Ed. 2d 787 (1989). "For a right to be deemed clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Buckley v. Rogerson*, 133 F.3d 1125, 1128 (8th Cir. 1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). However, "[i]t is only necessary that the unlawfulness of the official's act [be] apparent in view of pre-existing law." *Hall v. Lombardi,* 996 F.2d 954, 958 (1993), *cert. denied*, 510 U.S. 1047, 114 S. Ct. 698, 126 L. Ed. 2d 665 (1994). Therefore, if the law claimed to have been violated was clearly established, the qualified immunity defense ordinarily fails, "since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818-19, 102 S. Ct. 2727.

*Sexton v. Martin,* 210 F.3d 905, 909-10 (8th Cir. 2000).

Faircloth has asserted that the defendants violated her rights under Title VII, the Arkansas

Civil Rights Act, and the Equal Protection Clause of the Fourteenth Amendment by discriminating against her on the basis of her sex and retaliating against her for complaining of the alleged discrimination. An individual's rights to be free of sex discrimination and retaliation are clearly established. *See, e.g.*, *Peterson*, 406 F.3d at 526. The defendants' motion for summary judgment as to the issue of qualified immunity is denied.

## CONCLUSION

Faircloth has produced evidence sufficient to raise a genuine issue of material fact as to whether she was demoted on the basis of her sex and subjected to retaliation for subsequently complaining of sex discrimination. The defendants' motion for summary judgment as to Faircloth's sex discrimination claims under Title VII and the Arkansas Civil Rights Act, retaliation claim under the Arkansas Civil Rights Act, and equal protection claim under 42 U.S.C. § 1983 are denied. Because Faircloth has asserted violations of her clearly established rights under federal law, the defendants' motion for summary judgment on the ground of qualified immunity is also denied.

IT IS SO ORDERED this 20th day of February, 2007.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE